## 36791. STRICKLAND v. THE STATE.

UNDERCOFLER, Justice.

Robert William Strickland was convicted by a jury of the murders of Eddie Lee Carroll, Lester Lee Carroll and Bonnie Mae

---

Carroll, and for aggravated assaults upon Junie Irene Carroll, Elizabeth June Carroll and Cecil Carroll. The death sentence was imposed for each of the three murders. Consecutive ten-year sentences were imposed for the three aggravated assaults. His case is before this court on appeal, and for mandatory review of the sentences of death.[1]

1. Strickland's psychiatric evaluation ordered by the trial court[2] was not a "critical stage" of the proceedings; hence, no error was committed by denying his counsel's request to be present during the evaluation. United States v. Cohen, 530 F2d 43 (9) (5th Cir. 1976). The first enumeration of error lacks merit.

2. The trial court correctly submitted the issue of Strickland's mental competency to stand trial to a special jury rather than summarily declaring Strickland incompetent. Code Ann. § 27-1502 (a). Strickland contends in support of his second and third enumerations of error that the report of the Forensic Service Team unequivocally declared him incompetent to stand trial. However, the report shows that Strickland could understand the charges against him and appreciate the consequences, as well as communicate with his attorney.[3] The report merely expresses concern with Strickland's ability to deal emotionally with the testimony against him. The second and third enumerations of error are without merit.

3. The trial court did not err by refusing to direct a verdict for Strickland on the special plea of insanity or in thereafter ordering Strickland to stand trial on the indictments. Members of the Forensic Service Team testified that they were concerned with whether or not Strickland would be able to control his emotions during trial on the indictments; whether he might commit suicide. Dr. Ermutlu also testified, "I felt that he was aware of the charge, and he was aware of the consequences, and I also felt that he probably could communicate with his lawyer, if some relationship was established." Strickland contends that elsewhere in the transcript of proceedings Dr. Ermutlu contradicted himself, particularly in respect to the question of whether or not Strickland would be able to establish a

---

[1] Code Ann. § 27-2537.

[2] The authority of the trial court to order the evaluation was not questioned on appeal. Presnell v. State, 241 Ga. 49, 56 (6) (243 SE2d 496) (1978).

[3] The issue on a special plea of insanity is "whether he is capable at the time of the trial of understanding the nature and object of the proceedings going on against him and rightly comprehends his own condition in reference to such proceedings, and is capable of rendering his attorneys such assistance as a proper defense to the indictment preferred against him demands." Brown v. State, 215 Ga. 784, 787 (113 SE2d 618) (1960).

sufficient relationship with defense counsel to be able to assist in his defense. The State introduced lay testimony indicating that Strickland was feigning incompetency. There is no merit in Strickland's contentions that, in essence, the court or the jury was bound to accept the testimony favorable to his position and was bound to reject the testimony indicating his competency to stand trial. "Not only the presumption of sanity, *Johnson v. State,* 235 Ga. 486 (220 SE2d 448) (1975), but also the state's evidence, including the testimony of the psychiatrist, created an issue of fact on . . . [Strickland's] competency for the jury to decide." *Leggett v. State,* 244 Ga. 226, 227 (3) (259 SE2d 476) (1979). There is no merit in the fourth, fifth and forty-second enumerations of error.

4. Strickland contends in his sixth enumeration of error that the trial court should not have required him to plead to the indictment before his mental competency was determined under his special plea. The record fails to provide a factual basis for this enumeration of error. While represented by counsel, he pled to the indictment on January 18, 1980. His special plea was not filed until January 21, 1980, three days later. The sixth enumeration of error presents nothing for our consideration.

5. His seventh enumeration of error also is not supported by the transcript of proceedings, which shows without contradiction that that grand jury foreman, whose name appears on the State's list of witnesses, took no part whatsoever in the grand jury's deliberations regarding the indictments returned against Strickland.

6. The eighth enumeration of error, contending that the trial court erred in overruling Strickland's objections to the State's proposed voir dire questions numbers two and three, also finds no factual support in the transcript.[4] The trial court did not rule on the objections when made. Ruling was deferred until the next day to give counsel an opportunity to rewrite their questions. When the court inquired the next day whether the State's questions numbers one, two and three would be asked, defense counsel replied. "That's right." The State thereafter expressly withdrew question number two. The eighth enumeration of error presents nothing for our review.

7. Strickland contends in his ninth enumeration of error that the trial court improperly refused to allow him to ask his proposed voir dire questions numbers eleven, twenty-one, twenty-four and twenty-five to prospective special jurors. The transcript establishes that the trial court allowed his eleventh question to be asked.

---

[4] These questions related to the trial on the special plea of incompetence to stand trial.

Questions twenty-one, twenty-four and twenty-five were technical legal questions relating to whether or not the jurors knew the nature and purpose of the trial on the special plea. Answers to the questions would not reveal prejudice against the accused. The nature and purpose of the proceedings were explained to the jury in the court's charge. No manifest abuse of the trial court's discretion has been illustrated. *Kyles v. State,* 243 Ga. 490 (255 SE2d 10) (1979); *Welch v. State,* 237 Ga. 665, 671 (229 SE2d 390) (1976); *McNeal v. State,* 228 Ga. 633, 636 (187 SE2d 271) (1972).

8. Strickland contends in his tenth enumeration of error that the trial court should have excused prospective special jurors for cause. These persons are not named in the enumeration of errors or brief, but the page references to the transcript relate to the examination of Mr. Clarence A. Johnson and Mr. Earley Roberts, Jr. Mr. Johnson was excused for cause. Mr. Roberts responded that he could lay aside anything he might have heard, read or known about the case and base his verdict solely upon the evidence and the charge of the court. No error has been illustrated. *Westbrook v. State,* 242 Ga. 151, 154 (3) (249 SE2d 524) (1978).

9. The eleventh enumeration of error is unsupported by the transcript. Strickland apparently contends that the trial court required defense counsel to use the word "opinion" instead of the word "inclination" while examining prospective special jurors on voir dire. One or more jurors had expressed a lack of understanding of the meaning of the word "inclination." The court suggested the substitution of words. Defense counsel was permitted, however, to continue using the word "inclination" during examination of the remaining prospective special jurors. The eleventh enumeration of error is without merit.

10. The trial court did not err by failing on its own motion to order transcription of the opening statements of counsel on trial of the special plea. Trial of the special plea was civil in nature. *Williams v. State,* 238 Ga. 298, 303 (3) (232 SE2d 535) (1977).

Neither did the trial court err by refusing to allow defense counsel to explain during his opening statement and closing argument the consequences under Code Ann. § 27-1502 of a jury finding in favor of the special plea. See *Coker v. State,* 234 Ga. 555 (5) (215 SE2d 782) (1975). The twelfth and thirteenth enumerations of error are without merit.

11. The issue on the special plea was Strickland's mental capability and comprehension at the time of trial. *Crawford v. State,* 240 Ga. 321, 326 (240 SE2d 824) (1977). Accordingly, the trial court did not err in excluding on the State's relevancy objection testimony of one of the medical experts relating to whether or not treatment

would enable Strickland to stand trial at some future date. Code Ann. § 38-201. The fourteenth enumeration of error lacks merit.

12. Admitting the testimony of the ambulance dispatcher about a telephone call he received was not error. The dispatcher testified that the caller asked for an ambulance to be dispatched to a certain location on Whitmire Circle because there were five to seven people lying up there dead. The caller said he was the killer and that he was calling from a pay telephone because he had shot out the telephone at the house. He said he had been under medical treatment, was insane, and would turn himself in to the police. Witnesses testified that the location of the crime scene was as described by the caller and that the Carroll house telephone had been shot out. The arresting officer testified that Strickland expressed surprise at his arrest because he previously had indicated that he planned to turn himself in. These circumstances suffice for admissibility of the dispatcher's testimony. *Constantino v. State,* 243 Ga. 595 (255 SE2d 710) (1979); *Stanger v. State,* 102 Ga. App. 561 (116 SE2d 898) (1960). The fifteenth enumeration of error is without merit.

13. The trial court's comments and instructions to the jury were proper following Strickland's violent outburst in the courtroom during trial of his special plea of incompetency to stand trial. After Strickland's objection to the court's remarks, defense counsel was given an opportunity to submit a curative instruction to be given by the court. Counsel declined to prepare a specific curative instruction. Instead, he merely requested the court to give a general instruction to the effect that the court had not intended to express any opinion about Strickland's disruptive behavior. The court so charged the jury, and the defense expressed no objection to the charge. The charge was more than adequate to have cured any error if, indeed, there had been error. The sixteenth and seventeenth enumerations of error are without merit.

14. The trial court's charge to the jury on the issue of Strickland's special plea of incompetency to stand trial was full and fair. *Crawford v. State,* supra. The court need not have charged the exact words of Strickland's first request to charge. *Herrmann v. State,* 235 Ga. 400, 402 (220 SE2d 2) (1975). Neither did one chance use of the word "insane" instead of "incompetency" in the total context of a proper charge on incompetency to stand trial require reversal. *Echols v. State,* 149 Ga. App. 620 (2) (255 SE2d 92) (1979). The eighteenth, nineteenth and fiftieth enumerations of error are without merit.

15. Mrs. Dean was not disqualified for cause to serve as a juror. Her response on voir dire indicated that she would lay aside any impression or opinion she might have formed based on what she had

heard about the case and render a verdict based on the evidence presented in court.[5] *Mooney v. State,* 243 Ga. 373, 387-88 (254 SE2d 337) (1979); *Westbrook v. State,* supra at p. 154 (1). Furthermore, Strickland did not strike Mrs. Dean although he did not use all his strikes during the jury selection process. *Gee v. State,* 239 Ga. 583 (1) (238 SE2d 356) (1977). The twentieth enumeration of error lacks merit.

16. Strickland objected to the State's characterizing the killings as "brutal" during its opening statement. He contends that the court ignored his objection. To the contrary, the transcript reveals that the court in effect, if not in express words, sustained the objection by immediately admonishing the assistant district attorney that his opening statement "is limited to what you expect to show and the issues, and that alone." The trial court later charged the jury that the opening statements were not evidence. If additional admonitions or instructions were desired, they should have been sought by the defense. The word "brutal" as applied to the killings the prosecution was seeking to prove was not inherently damaging. *Pryor v. State,* 238 Ga. 698, 706 (7) (234 SE2d 918) (1977). No error has been illustrated. The twenty-first enumeration of error is without merit.

17. (a) Admission of certain photographs and letters into evidence was not error. Various ones of the photographs illustrated the premises, the locations of the victims' bodies, and the locations, nature and extent of their wounds. Other photographs showed the gunshot damage to the telephone that the victim June Carroll was using to call the police when Strickland first shot the telephone then repeatedly shot her. The photographs were relevant and admissible. *Whitaker v. State,* 246 Ga. 163, 165 (6) (269 SE2d 436) (1980). Although portions of some of the photographs overlap with other photographs, we certainly cannot conclude that they are "duplications" and "therefore repetitious and designed to be inflammatory."

(b) June Carroll's testimony established that because she was Strickland's former girl friend she was acquainted with his handwriting. Although she had not received the last of the letters before the killings, her identification of Strickland's handwriting was sufficient to authorize introduction of all of the letters, including the last one. *Daniels v. State,* 132 Ga. App. 673, 676 (3) (209 SE2d 72) (1974). The twenty-second enumeration of error is without merit.

18. Admission of the testimony of a ballistics expert that he had checked Strickland's hands for gunshot residue soon after arrest was

---

[5] "I would listen to the testimony and judge for myself."

not error. The expert testified that the tests were negative, indicating either that Strickland had not discharged a firearm or that he had washed his hands. The samples themselves were not introduced. Swabbing the hands of an accused to lift gunshot residue does not constitute an unconstitutional search or seizure; and testimony of an expert concerning the swabbing procedure, its physical results and his opinion based on those results does not violate the privilege of the accused against self-incrimination. *Strong v. State,* 231 Ga. 514, 519 (202 SE2d 428) (1973); *Creamer v. State,* 229 Ga. 511, 516 (192 SE2d 350) (1972). The twenty-third enumeration of error lacks merit.

19. Enumerations of error twenty-four through twenty-nine and thirty-two through forty relate to the refusal of the trial court to give Strickland's requests to charge numbered one through nine. The court's charge adequately covered the defenses of insanity and delusional compulsion. Accordingly, failure to charge in the exact language requested was not error. *Irwin v. State,* 244 Ga. 850, 853 (4) (262 SE2d 99) (1979). It was not error for the trial court to decline to charge the provisions of the Code relating to the duty of the judge, and the hospitalization of the accused, in the event the jury specified that acquittal was on account of insanity. *Pierce v. State,* 231 Ga. 731, 733 (5) (204 SE2d 159) (1974). The State did not have the burden of proving the sanity of the accused beyond a reasonable doubt. *State v. Avery,* 237 Ga. 865, 866 (230 SE2d 301) (1976). There was no factual basis for a charge on voluntary or involuntary manslaughter. "The presumption of sanity does not dissipate with the presentation of evidence to the contrary . . . The jury is free to reject the testimony of both lay and expert witnesses as to the sanity of an accused, and rely instead on the presumption of sanity with which the accused entered his trial." *Potts v. State,* 241 Ga. 67, 82 (243 SE2d 510) (1978). Good character was charged as requested. None of these fifteen enumerations of error has any merit.

20. The trial court properly refused to allow the defense to open up once more the issue of whether or not Strickland was competent to stand trial. This issue already had been adjudicated on the special plea. Strickland contends the purpose of going into this question once more was to show the jury that he could not testify. There is no merit in the thirtieth enumeration of error.

21. No error was committed by precluding defense counsel from alluding during his closing argument to the consequences[6] of a verdict of not guilty by reason of insanity. Such matters are inappropriate for

---

[6] Hospitalization, etc.

inclusion in the court's charge. *Hulsey v. State,* 233 Ga. 261 (210 SE2d 797) (1974). For the same reasons of policy, they are inappropriate for the defense's closing argument. The thirty-first enumeration of error lacks merit.

22. The court properly charged the jury about the forms of possible verdicts. The forty-first enumeration of error is without merit.

23. The jury found "that the offense of murder of Bonnie Mae Carroll was outrageously and wantonly vile, horrible and inhuman in that it involved depravity of mind." The jury further found that "the offense of murder of Eddie Lee Carroll was committed while the defendant was engaged in the commission of another capital felony, the murder of Bonnie Mae Carroll." As to the remaining murder count, the jury found that "the offense of murder of Lester Lee Carroll was committed while the defendant was engaged in the commission of other capital felonies, the murder of Bonnie Mae Carroll and Eddie Lee Carroll." Accordingly, this case does not involve what has come to be known as "mutually supporting aggravating circumstances" within the meaning of *Gregg v. State,* 233 Ga. 117 (210 SE2d 659) (1974). *Legare v. State,* 243 Ga. 744, 747 (4) (257 SE2d 247) (1979); *Peek v. State,* 239 Ga. 422, 428 (6) (238 SE2d 12) (1977). Further review of the aggravating circumstances found by the jury is set forth under the sentence review, infra. The forty-third and forty-fourth enumerations of error are without merit.

24. No evidence in aggravation was offered by the State during the presentence hearing. Rather, the State relied on evidence submitted during the guilt-innocence phase of the proceedings. The State's notice of aggravating circumstances, given some forty-nine days before trial, did not fail to comply with Code § 27-2503. Due process concepts are not involved. *Bowden v. Zant,* 244 Ga. 260, 263 (15) (C) (260 SE2d 465) (1979). The forty-fifth enumeration of error lacks merit.

25. The forty-sixth enumeration of error, wherein Strickland contends that the trial court erroneously refused to allow him to recall a State's witness on the issue of mitigation, lacks a factual foundation in the transcript of proceedings. Drs. Ermutlu and Eichler of the Forensic Services Team were subpoenaed by the State and examined extensively by Strickland during trial of the special plea of incompetence to stand trial. Both were excused after that trial. Dr. Eichler testified again during the guilt-innocence phase, and again was excused. Dr. Ermutlu was not available and had not been subpoenaed. The court exercised its discretion and granted a continuance so that Dr. Ermutlu could testify the next morning. Following his testimony, he again was excused. After return of the

verdicts of guilty, Strickland moved for another psychiatric evaluation. The court denied this motion, stating that the doctors could be called as witnesses. Counsel for the defense then admitted he had not subpoenaed the doctors, and the court in exercise of its discretion denied him a second continuance to have them present. The transcript reveals that the defense wanted the witness to testify that Strickland was incompetent to stand trial, an issue that previously had been adjudicated on trial of the special plea. No manifest abuse of discretion has been illustrated. *McCrary v. State,* 229 Ga. 733 (2) (194 SE2d 480) (1972).

26. No error was committed in giving the jury the written list of aggravating circumstances as charged by the court. *Tucker v. State,* 244 Ga. 721, 729 (10) (261 SE2d 635) (1979); *Spraggins v. State,* 243 Ga. 73, 74 (2) (252 SE2d 620) (1979). The forty-seventh enumeration of error lacks merit.

27. The jury sent a note to the court asking about the possibility of parole if Strickland received a life sentence. The court instructed the jury that their obligation was to return a verdict on the evidence and charge of the court; that they were responsible for the truth of their verdict but not its consequences; that under law the court could not answer their questions about parole. "[A] trial court's flat refusal to answer a question about parole is not improperly suggestive and is not error." *Tucker v. State,* supra at p. 730 (11). The forty-eighth enumeration of error is without merit.

28. The forty-ninth enumeration presents Strickland's contention that the trial court erred in submitting the trial judge's report at the termination of the trial. This ground was not briefed or argued. Because this is a death case, we have considered the enumeration. We find no reversible error in the report itself or in the manner or method of its submission. The forty-ninth enumeration of error is without merit.

29. The death penalty opposition responses of the venire persons who were excused for cause met the requirements of Witherspoon v. Illinois, 391 U. S. 510 (88 SC 1770, 20 LE2d 776) (1967), as reiterated in Lockett v. Ohio, 438 U. S. 586 (98 SC 2954, 57 LE2d 973) (1978). *Hance v. State,* 245 Ga. 856, 864 (6) (268 SE2d 339) (1980).

30. The jury heard evidence authorizing the following to be found as facts beyond a reasonable doubt. June Carroll and Strickland had dated for several years. June had terminated the relationship. Strickland had tried to reestablish the relationship. Alternatively, he begged her to be his wife and threatened her if she refused. About three weeks before November 30, 1979, Strickland asked June how she would like it if he killed her mother, brother and

sister so she could see how it was to lose someone she loved. He sounded forceful. She hung up the telephone.

Thereafter he wrote her several letters, pleading, sometimes on religious grounds, for her to marry him, and alternately threatening that if she did not marry him he would go insane and do something he would be sorry for. In the letters, he agreed to hold his temper, to be gentle, and to attend church with her. The last of the letters, postmarked November 29, 1979, had "Last Letter" written on the envelope. In it, he stated that he could be pushed only so far, that he must prove to her he said what he meant, and that if she were to date anyone else, he would do what he said he would do.

On the evening of November 29th, he went to the Carroll house and attempted to persuade June that they were man and wife within the meaning of certain biblical verses. When the discussion became unpleasant, and one of June's male relatives told him to leave, he left stating "I'll see ya'll in court."

During the day on November 30, 1979, he bought a box of 9mm. ammunition and attempted to buy an extra magazine or clip for his Browning High Power 9mm. semi-automatic pistol. That night, he went again to the Carroll residence after telling June that he wanted to pick up some things he had given her in the past. He wore his heavy coat in the Carroll residence which concealed the large, multi-shot automatic pistol. He followed June back to her bedroom, continuing to plead with her about their relationship.

After June left the room, hoping Strickland would leave, she heard her sister Bonnie tell Strickland, "You're getting June upset, why don't you just leave her alone and leave?" She heard Strickland respond in a loud voice, "I've heard enough of you, shut your damn mouth," after which she heard Bonnie scream, "No, Rob, don't."

The shooting then started. While Strickland was shooting Bonnie, June ran to the hall telephone to summon help. Strickland followed her into the hallway. While June pled for mercy, Strickland first shot the telephone, and then shot June twice in the abdomen, twice in each thigh, five times in her lower buttocks around her rectum and vagina, and once in her right foot. While leaving the Carroll home, he shot and killed June's disabled brother, Eddie, killed her father, Lester, and wounded her mother, Junie. Her brother Cecil saw Strickland shooting, and the empty cartridges flying from the pistol, but he ran and avoided either being killed or wounded.

Strickland then shot through the gas tank of the Carroll automobile, and drove away.

The ambulance dispatcher on duty on the night of the shootings

testified that he received a telephone call from a male who said that an ambulance was needed on Whitmire Circle because there were five to seven people lying up there dead. The caller declined to give his name and telephone number but identified the place on Whitmire Circle. The caller said he was the one who had done it, that he was insane, and that he had been under medical care. When the dispatcher asked the caller to tell where he was, the caller said he was at a pay phone booth in White County; that the phone in the Whitmire Circle house was not working because he had shot it too. The caller asked the dispatcher to send help and said he would turn himself in.

Testimony of the investigating officers and of surviving members of the Carroll family who were present during the shootings[7] described the crime scene, including the many shots that were fired and the position of the bodies. An empty magazine for a 9mm. pistol of the type found in Strickland's automobile at the time of his arrest was found in the Carroll house. When Strickland was arrested, the pistol's magazine was loaded alternately with solid and hollow point rounds of ammunition. The pistol was lying on the automobile seat within easy reach. Strickland questioned the arresting officers as to why he was being arrested since he had agreed to turn himself in.

Ballistics evidence established that the many empty pistol cartridge casings found in and outside the Carroll home were fired in Strickland's pistol. Bullets removed from the victims' bodies had been fired from Strickland's pistol.

Medical testimony established that Bonnie's head and face were badly mutilated by either four or five shots fired at a distance of six inches or less. The exact number of shots could not be determined because of the massive damage and disfigurement to her face. She died from injuries to her brain. Lester was shot twice in the left side and once in the neck. He died of his chest wounds. Eddie died of two shots in his chest and abdomen.

Strickland pled both incompetency to stand trial and insanity at the time of the offenses. During trial of the special plea of incompetency to stand trial, the examining professionals expressed concern about how trial on the indictments might impact upon Strickland's emotional problems, particularly, whether he might commit suicide. However, Dr. Ermutlu testified, "I felt that he was aware of the charge, and he was aware of the consequences, and I also

---

[7] June, Ronnie and Cecil survived and testified.

felt that he probably could communicate with his lawyer, if some relationship was established." The jury found against Strickland on his special plea. During trial on the indictments, Dr. Ermutlu testified: "I don't have any question in terms of his capacity to distinguish right from wrong."

A crime lab expert testified that he performed a standard test on Strickland's hands to determine the presence or absence of gunshot residue. Finding none, his opinion was that Strickland either had not fired a pistol that day or had washed his hands. The jury was entitled to find from the testimony of the surviving members of the Carroll family that the latter alternative was the fact.

The foregoing evidence is sufficient to support the verdicts of guilty under the current legal standard. Jackson v. Virginia, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

### Sentence Review

As required by Ga. L. 1973, p. 159, et seq., Code Ann. § 27-2537 (c) (1-3), we have reviewed the three death sentences imposed in this case. We have considered pursuant to the mandate of the statute the aggravating circumstances found by the jury, and the evidence concerning each crime and the defendant. We conclude that the sentences of death imposed in this case were not imposed under the influence of passion, prejudice, or any other arbitrary factor.

The jury found the following aggravating circumstances:

(1) Count 1. "The offense of murder of Eddie Lee Carroll was committed while the defendant was engaged in the commission of another capital felony, the murder of Bonnie Mae Carroll." Code Ann. § 27-2534.1 (b) (2).

(2) Count 2. "The offense of murder of Lester Lee Carroll was committed while the defendant was engaged in the commission of other capital felonies, the murders of Bonnie Mae Carroll and Eddie Lee Carroll." Code Ann. § 27-2534.1 (b) (2).

(3) Count 3. "The offense of murder of Bonnie Mae Carroll was outrageously and wantonly vile, horrible and inhuman in that it involved depravity of mind." Code Ann. § 27-2534.1 (b) (7).

We have applied Code Ann. § 27-2534.1 (b) (2) when two murders were committed in a relatively short period of time in what could be fairly viewed as one continuous course of criminal conduct. *Peek v. State,* 239 Ga. 422, 431 (238 SE2d 12) (1977). One murder in *Peek* was committed in order to accomplish the kidnapping-rape, whereas the other murder was committed in order to avoid apprehension. One of the murders in *Peek* may not even have been within the defendant's contemplation when he was committing the other. The overwhelming and uncontradicted evidence in the present

case was that the murders of Lester and Eddie Carroll occurred while Strickland was leaving the Carroll house immediately after he had killed Bonnie and wounded June and her mother. The total time interval was very brief. Furthermore, the wounds inflicted upon the members of the Carroll family were part of his carefully planned and carried out plan, conceived during the weeks before the homicides, to inflict mental distress upon June because she had refused to marry Strickland. He had warned June that he would kill members of her family if she did not marry him. He again had warned her that he said what he meant and that he only could be pushed so far. His final warning was that he would do what he had told her he would do. The separate murders were components of his overall plan. These facts present a compelling case for application of Code Ann. § 27-2534.1 (b) (2) to counts one and two.

The present case is distinguishable from Godfrey v. Georgia, 446 U. S. 420 (100 SC 1759, 64 LE2d 398) (1980) in numerous respects. The jury's finding in respect to count three, the murder of Bonnie Carroll, was not partial as in Godfrey. Here, the jury found the first component of Code Ann. § 27-2534 (b) (7)[8] and one of the three sub-parts of the second component.[9] *Hance v. State,* supra at p. 860. The present case is among "those cases which lie at the very core of the Code section." *Hance,* supra at p. 860. It is not among those "ordinary murders for which the penalty of death is not appropriate." *Hance,* supra at p. 861. The homicides in the present case did not arise out of a husband-wife domestic dispute. To the contrary, the killings were the culmination of a preconceived plan to inflict mental distress upon June Carroll because she declined to become involved in Strickland's emotional problems by becoming his wife. Bonnie Carroll, June's sister, was not threatening Strickland or subjecting him to any emotional trauma. She merely was pleading with him not to inflict any more mental distress upon her sister, June, and to leave the Carroll residence.

In *Hance,* supra at p. 862, we held, citing Godfrey v. Georgia, supra, that "The instantaneous death of a victim as a result of being killed by a shotgun, although the scene of death be gruesome (no other facts appearing), does not constitute torture, aggravated battery or depravity of mind." The scene of Bonnie's death was gruesome. She had been shot through her head and face with hollow-point bullets fired from a powerful automatic pistol held less

---

[8] " 'The offense of murder . . . was outrageously or wantonly vile, horrible or inhuman . . .' "

[9] " '. . . in that it involved . . . depravity of mind. . .' "

than six inches from her head. The destruction was so extensive that the medical witness only was able to testify that she was shot either four or five times. This, alone, no other facts appearing, might not suffice for a finding under Code Ann. § 27-2534 (b) (7). *Hance,* supra. But other facts do appear. Strickland did not fire wildly, hitting his victims' bodies at random locations. He fired with a single purpose in mind — to inflict mental and physical pain upon June Carroll, who had rejected his marriage proposal. The lay and expert testimony in the present case established that Bonnie's death wounds were intended to be, and were, gruesome for the purpose of hurting June, just as June's own wounds were intended not to kill June but to cause her great physical pain, and to cause her great mental anguish by disfiguring her body so she would not be desirable to any other man. Strickland accurately and methodically shot June twice in her abdomen, twice in each thigh, five times in her buttocks around her rectum and vagina, and once in her right foot. Strickland wanted June to live. He called an ambulance in an effort to make sure she did live. He was successful. She lived to experience all the physical and mental suffering he inflicted upon her.

Depravity may be proven in many ways, including, as in the present case, by the killing of a victim in a vile, horrible or inhuman manner so as to inflict mental distress upon her close relative. *Blake v. State,* 239 Ga. 292 (236 SE2d 637) (1977). We deem it appropriate to consider the nonfatal wounds inflicted upon June as well as the fatal wounds inflicted on Bonnie because they all are aspects of the same depraved plan to inflict mental distress on June. Code Ann. § 27-2534.1 (b) (7) was constitutionally applied in this case. Godfrey v. Georgia, supra.

We find that the evidence factually substantiates and supports the finding of the foregoing aggravating circumstances and the sentence of death by a rational trier of fact beyond a reasonable doubt. Jackson v. Virginia, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). We thoroughly have reviewed the instructions of the trial court during the sentencing phase of the trial, and find that the charge was not subject to the defects dealt with in *Fleming v. State,* 240 Ga. 142 (240 SE2d 37) (1978), and *Hawes v. State,* 240 Ga. 327 (240 SE2d 833) (1978). In reviewing the death sentence imposed in this case, we have considered the cases appealed to this court since January 1, 1970, in which a death or life sentence was imposed. We find that the following similar cases listed in the appendix support affirmance of the death penalty. Appellant's sentence to death for murder is not excessive or disproportionate to the penalty imposed in similar cases considering the crime and the defendant.

*Judgment affirmed. All the Justices concur, except Gregory, J.,*

*not participating.*

DECIDED FEBRUARY 10, 1981 —
REHEARING DENIED MARCH 3, 1981.

*John N. Crudup,* for appellant.

*Jeff Wayne, District Attorney, Arthur K. Bolton, Attorney General, William B. Hill, Jr., Assistant Attorney General,* for appellee.

APPENDIX.

*Jackson v. State,* 229 Ga. 191 (190 SE2d 530) (1972); *Morgan v. State,* 231 Ga. 280 (201 SE2d 468) (1973); *Chenault v. State,* 234 Ga. 216 (215 SE2d 233) (1975); *Smith v. State,* 236 Ga. 12 (222 SE2d 308) (1976); *Coleman v. State,* 237 Ga. 84 (226 SE2d 911) (1976); *Harris v. State,* 237 Ga. 718 (230 SE2d 1) (1976); *Dix v. State,* 238 Ga. 209 (232 SE2d 47) (1977); *Blake v. State,* 239 Ga. 292 (236 SE2d 637) (1977).