## 39046. WILCOX v. THE STATE.

BELL, Justice.

The appellant was tried in the Lowndes County Superior Court for the murder of Hellen Hanks and for the unlawful concealment of her death. On January 14, 1982, the jury found the appellant guilty of both offenses. He was sentenced to life imprisonment for murder and to a consecutive twelve-month sentence for concealing the murder. He appeals.

On August 31, 1972, a Thursday, the victim, thirty-five year-old Hellen Hanks, disappeared. At that time, she was working as a bookkeeper and secretary for Wilcox Outdoor Advertising in Valdosta, a company owned by the appellant, E. K. Wilcox, Jr. and his father, E. K. Wilcox, Sr. Her body was discovered approximately eight years later, on November 24, 1980, by a logger clearing a wooded area.

On August 31, 1972, Hellen went to work as usual. She was wearing a dark green dress with a long strand of green beads. After work, she planned to have her hairpiece combed and her typewriter repaired. Jerry Davis, an employee of Wilcox Outdoor Advertising, testified that he saw her in the office at about 8:15 a.m. before he left on an assignment.

At about 5:00 p.m. that afternoon, James Hanks, the victim's husband, received a telephone call from the appellant. Hanks

testified that the appellant told him that Hellen could not be found around the office, although her car was still there. Mr. Hanks then immediately drove to the Wilcox Outdoor Advertising office, arriving there at about 5:20 p.m. or 5:25 p.m. He testified that when he arrived, the appellant was going through Hellen's purse. He asked the appellant what he was doing, and he responded he was looking for some keys that Hellen would "not be needing . . . any longer."

At approximately 5:30 p.m. the Valdosta police and GBI agents, responding to the appellant's call, arrived at the Wilcox business. They unsuccessfully searched the office and warehouse for Hellen, but they did find her typewriter and hairpiece in the car and two completed applications for employment in her purse. Since they found no evidence indicating where Hellen might be, a missing person's report was filed.

The Valdosta police continued their investigation of Hellen's disappearance for several days before discontinuing it because neither Hellen nor any new evidence was found. Similarly, though the GBI investigation lasted longer, it was discontinued for lack of evidence.

On November 24, 1980, Fred Blanton, a logger, was digging up roots with a plow while clearing a wooded area off Indian Creek Road when he unearthed a wooden box. The plow ripped off the top of the box, which had been nailed shut, exposing a skeleton. Mr. Blanton called the police to the scene. In addition to the skeleton, the following items were found in or around the box: a metal cash box, a second metal box, a bank bag, receipt books, a padlock with a key inserted, several other keys, portions of a dress, a wedding ring, lingerie, shoes, a mass of hair, and a length of rope. The dress, the padlock, and the other keys were found under the burial box, and the lingerie was found rolled up in a ball next to it.

Because papers found referred to Wilcox Outdoor Advertising, an officer called the appellant to inquire if he was missing certain items. As a result of the call, but not at the request of the officer, the appellant came to the scene.

The burial box, the skeletal remains, and other items found at the scene were collected and examined. Dr. James Howard of the State Crime Laboratory examined the rope and testified that hairs, consistent with hairs taken from the mass of hair found in the box, were embedded in the surface of the rope, a condition, he testified, that would not exist as a result of casual contact. He testified that the combination of the condition of the hair and its adherence to the rope was consistent with it having been embedded in the rope while the victim was alive. He testified that the curl or loop in the rope was consistent with it having been crossed or tied and left that way for a

long period of time. Although witnesses testified that the rope found in the grave was similar to rope used at Wilcox Outdoor Advertising, Dr. Howard testified that he had compared rope samples taken from the Wilcox business in 1980 to the rope found in the grave, and they did not match. He attributed the difference to the use of different rope fibers in 1972.

Several witnesses testified that the burial box was similar to boxes used by Wilcox Outdoor Advertising, and the appellant, while at the burial site, told several officers the box used to bury Mrs. Hanks looked like one that had been reported missing from the business in 1972. These boxes are approximately four feet long, two to three feet wide, and two to three feet deep and are made of wood, except for the top which is metal. In 1972, two trucks used at Wilcox Outdoor Advertising were fitted with these boxes to carry equipment. A third box of this type was kept in the back of the warehouse. Willard King, the appellant's father-in-law, and now production manager of the Wilcox business, worked part-time on Saturdays in 1972. He testified that he found this extra box was missing on the second Saturday, or nine days, after Hellen's disappearance. He had not worked the previous Saturday. He stated that he told the appellant the box was missing, and that the appellant said he would report it to the police, since Mrs. Hanks was also missing.

Other items found at the scene were also connected to the appellant's business. One of the keys fit a 1971 Ford pick-up truck, which was being driven by the appellant in 1972. There was testimony that there were two keys for this truck, one kept by the appellant, and one kept by Hellen Hanks while she was the secretary. In 1979, this truck was purchased from the appellant by Salem Scott, who testified the appellant gave him only one ignition key.

The cash box and the rusted padlock with the key in it were linked with the Wilcox business. To service its vehicles, the company had a gas pump located behind the building. The switch for this pump was located inside the office and was secured with a padlock. There was testimony that Hellen Hanks kept the key to this padlock in the cash box in her office. If employees wished to use the pump, they had to get the key from Hellen. The key found in the padlock opened it, and a key taken from the appellant's desk drawer one week after the burial site was uncovered also fit the rusted padlock.

Many of the personal belongings found at the burial site, such as the dress, the wedding ring, and the beads, were identified by Hellen's family as belonging to her. Both the dress and the bra showed signs of being torn or cut.

Medical studies and comparisons were conducted on the skull and other skeletal remains. Dr. Robert Johnson, a dentist, compared

the skull to Hellen's dental records, and established the skull to be Hellen's. Dr. Larry Howard of the Georgia State Crime Lab conducted two examinations of the skeletal remains, one shortly after the bones were found, and another in August of 1981.

Dr. Howard concluded the first examination of the skeletal remains about March 10, 1981. He testified that he was not able to establish the cause of death, but that, nevertheless, he was of the opinion that she was strangled. He based this opinion on his knowledge of the conditions of the burial site and on other items found at the burial site, particularly the rope, which was found tangled in hair and lying in the chest or neck area of the skeleton, and which, he testified, had the approximate diameter of a neck when allowed to assume its own shape.

After statements taken from two employees of Wilcox Outdoor Advertising in July of 1981 indicated that the body may have been dismembered before burial, the remains were exhumed, and a second examination was performed. It revealed evidence of dismemberment of the left knee joint. Dr. Howard testified that after cleaning the knee joints, he found two linear or vertical, as opposed to horizontal, abrasions on the back of the left knee cap. He testified the abrasions were made by a pointed instrument, and that brown bodily fluid stains on the knee cap and the lack of abrasions in the dirt covering the knee cap indicated that the dismemberment occurred prior to the first burial. He also found a possible associated lesion or slice mark on the bottom of-the large thigh bone (the femur) of the left leg, located on the same side of the leg as the abrasions on the knee cap.

The left knee cap and the femur were also examined by Dr. Ellis Kerley, a leading forensic pathologist from the University of Maryland. He agreed that there were two incised marks on the back of the left knee cap and one on the femur. Though he could not be positive of dismemberment in this case, he found these cut marks to be consistent with dismemberment shortly after death.

Contrary testimony was offered by Dr. Joseph Burton. He testified that the bone exposed by the cut marks on the knee cap and femur was not mineralized or oxidized, as was other unmarked bone, indicating that these marks were a recent injury to these bones. He did not think that these marks were consistent with dismemberment of the leg.

After the discovery of the remains of Hellen Hanks, an investigation of her murder began. The police interrogated two employees of Wilcox Outdoor Advertising, Lorenzo Marshall and Ed Wrentz, who gave statements incriminating the appellant.

Lorenzo Marshall, who started work for the Wilcox business in 1952, gave a signed written statement on July 2, 1981, which was

witnessed by Ed Wrentz. He stated that he did not remember the date, but that shortly after Mrs. Hanks disappeared, Ed Wrentz came to him and asked him to help him dig a hole. He stated that the appellant then drove them in his truck somewhere, where they dug until they had to stop because of rain, at which time the hole was about waist deep. He stated that he did not remember when, but that he and Ed Wrentz later met the appellant and his father at Wilcox Outdoor Advertising, at which time the appellant had them load a box on his truck and drove them to the hole, where he and Ed finished digging and buried the box. He also stated that Ed threw something that looked like a dress into the hole before the box was lowered.

At trial, Marshall recanted his story, maintaining that he was in Albany, Ga. from Tuesday until Friday, September 1, 1972, and that he had nothing to do with a burial. Two other witnesses, both employees of Wilcox Outdoor Advertising, testified to this effect. Both testified that they were in Albany working with Marshall during the week of Hellen's disappearance, and that they did not arrive in Valdosta until that Friday afternoon. Marshall testified that he told the officers from the very beginning he didn't know anything about a burial. He testified that the officers put words in his mouth by telling him what Ed had said. He testified that since he was scared and wanted to go home, he went along with the story.

Ed Wrentz, who was seventy-eight at the time of trial and who had worked for the Wilcox business for more than thirty years, gave a signed statement on July 1, 1981 incriminating the appellant. Unlike Marshall, he recounted basically the same story on direct examination at trial. He testified that shortly after Mrs. Hanks disappeared, he and Lorenzo Marshall were driven into the country by the appellant to dig a hole, but that they did not finish because of rain. He testified that he didn't remember the date, but that it was dark, though it hadn't been dark long. He testified that at a later date, he and Lorenzo met the appellant and his father at the warehouse, at which time he and Lorenzo put Mrs. Hank's body into a box and loaded it onto a truck. He testified that the body was stiff and that extra pieces, which he thought were part of her legs, were also put in the box. He testified that they then drove to the hole, at which time he and Lorenzo finished digging the hole and placed the box, along with a few other things, into it.

After testifying to the above story on direct, Wrentz repudiated it on cross. He stated that the first time he talked to the police, he told them he didn't know anything about Mrs. Hanks's disappearance. He testified he told the truth on that occasion and that that was the truth now, i.e., at the time of trial. He testified on cross that he was out-of-town Thursday, August 31, 1972 and Friday, September 1,

1972, but arrived back in Valdosta that Saturday. This testimony contradicted the statement he gave to police, which was that he and Lorenzo helped dig a hole the night of Hellen's disappearance. Mr. Wrentz, however, did testify on cross that he did get a box from the warehouse and that he did dig a hole.

On redirect, Mr. Wrentz reiterated that he and Lorenzo put Mrs. Hanks's body in a medium sized box, were driven somewhere in a Ford pick-up truck, dug a hole, and buried the box. Also, his description of the burial site before its clearance by Fred Blanton was consistent with that of other witnesses. He described a gravel road, off of which was a three-path-road surrounded by woods, which ran past the burial site.

Concerning his activities on August 31, 1972, the appellant gave a statement to the police in October of 1972 and testified at trial. It is undisputed that the appellant and his father left Atlanta on the morning of August 31, 1972 to return to Valdosta. They had been there since Tuesday, August 29, 1972 on a business trip. The crucial issues concern his time of arrival in Valdosta and his activities once there.

In October of 1972, the appellant talked with GBI agent Larry Oxford. He stated that while driving back to Valdosta on August 31, 1972, he and his father stopped around 1:00 p.m. to visit a couple of friends, Willard King and Howard Holt, in Cordele. He stated that they left Cordele and arrived at his father's home in Valdosta around 3:45 p.m. From there, they drove separate cars to the office and arrived there around 4:00 p.m. He stated that Hellen was not there when they arrived, although her car and purse were, and since he and his father could not find her, they called Mr. Hanks and the police around 5:00 p.m.

At trial, the appellant recounted basically the same story. He testified that on their return from Atlanta, he and his father stopped in Cordele about 1:00 p.m. to visit his father-in-law, Willard King, stayed there approximately an hour, and then left for Valdosta. They got off of I-75 at their Valdosta exit around 4:00 p.m., give or take a few minutes. From there, he testified they went to the family home so he could pick up his car. They drove separate cars to the office, arriving between 4:15 p.m. and 4:30 p.m. He testified that Hellen was not there when they arrived and they looked for but were unable to locate her. As a result, he testified, he called Mr. Hanks about 4:45 p.m. to inquire about Hellen and called the police shortly thereafter. He testified that he did not notice if Hellen's purse was at the office, and he denied looking through it, though he did state that either he or his father asked Mr. Hanks to look in her purse to see if her office keys were in it. He testified that Mr. Hanks found them and handed them

to him. He denied making the statement that she wouldn't be needing the keys anymore. The appellant's father testified to basically the same facts concerning the time of their arrival and the circumstances following it.

The appellant claimed that at the time of the initial search for Hellen by Mr. Hanks and the police, the entire office was available to be searched. Both the appellant and his father testified that Wilcox, Sr. was at the office during the search. The appellant testified that the search lasted until around 8:00 p.m., at which time he left the office, went home and washed up, and drove to a dinner honoring him and his wife, arriving there between 8:30 p.m. and 9:00 p.m. After the dinner, he testified that he first went back to the office to make sure the doors had been locked and then went home.

However, there was testimony contradicting some of the above assertions. First, Mr. Hanks and two police officers testified that the appellant's father was not at the office while they were there. Second, two police officers testified that the search ended about 6:30 p.m. In addition, there was testimony that only Mrs. Hanks's car, the appellant's car, a police car, and a truck were at the office on the afternoon of August 31, 1972, indicating that the appellant's father, who drove there in his own car, was not at the office.

The appellant's ex-wife and her father, Willard King, contradicted the appellant's and his father's testimony concerning their time of arrival in Valdosta on August 31, 1972. The appellant's ex-wife testified that the appellant called her shortly after 5:00 p.m. on August 31, 1972. She testified that he told her that he and his father had arrived at the office between 3:00 p.m. and 3:30 p.m., and had found the door open, but couldn't find Mrs. Hanks. Willard King testified that on August 31, 1972, the appellant and his father stopped in Cordele to visit him at approximately 1:00 p.m. and left about 1:30 p.m. The appellant's ex-wife testified that she and her husband had previously driven from Valdosta to Cordele several times in around 60 to 70 minutes (the speed limit at that time was seventy miles per hour). Mr. King testified the drive should take about one and one-half hours.

On the evening of August 31, 1972, a party honoring the appellant and his ex-wife was scheduled. The appellant's ex-wife testified that when she talked to the appellant shortly after 5:00 p.m., he told her to go to the party without him, because he wasn't sure what time Mr. Hanks and the police would leave the office. Both the appellant's ex-wife and her mother testified that the appellant and his father did not arrive at the party until 9:00 p.m. There was testimony that the police left the Wilcox business premises at about 6:30 p.m. The appellant's ex-wife also testified that after the party

ended at 10:30 p.m., the appellant, instead of going home with her, told her that he needed to go back to the office to make sure everything was locked. She testified that though he was in bed the next morning when she awoke, he had not come home before she went to sleep around 11:00 p.m. and did not wake her when he did come home. The appellant testified that he arrived home about thirty to forty minutes after leaving the party.

Several witnesses testified to strained relations between the appellant and Hellen Hanks. Dorothy Edwards, Hellen's best friend, testified that the Sunday before Hellen disappeared Hellen told her she was afraid of the appellant and was looking for other employment. Dorothy testified that Hellen told her that she slapped the appellant one day because he grabbed her on the buttocks.

Another friend, Cara Ardrengo, testified that the Tuesday before Hellen disappeared Hellen spoke with her and expressed fear of the appellant and a desire to get away from him by finding other employment. She testified that Hellen told her that she was keeping two sets of books, one that was good, and one that wasn't good, and that she didn't like to be in that position.

Jerry Davis, an employee of Wilcox Outdoor Advertising at the time of Hellen's disappearance, testified that he saw the appellant and Hellen appear disturbed when they bumped into each other in a doorway, and another employee, John Goodman, testified that he saw the appellant place his hands on Hellen, who then pushed them away. He also said he heard appellant call Hellen a "dumb bitch."

Lucy Hanks, Hellen's daughter, also testified that Hellen wanted a new job because she did not like the appellant. Lucy testified that one day, several weeks before her mother's disappearance, her mother came home crying because she had slapped the appellant for making a pass at her.

The appellant denied that he had ever touched or patted Hellen and that she had ever slapped him. He testified that though he had been irritated with her on one occasion, she was a good employee with whom he never had any difficulty.

1) In his third enumeration of error, the appellant contends that the evidence against him was entirely circumstantial and did not exclude every other reasonable hypothesis except that of his guilt, see OCGA § 24-4-6 (Code Ann. § 38-109), and that the evidence was insufficient to support a conviction under the standards of Jackson v. Virginia, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

We disagree. After reviewing the evidence in a light most favorable to the jury's verdict, we conclude that a rational trier of fact could reasonably have found the appellant guilty of the murder of Hellen Hanks and the subsequent concealment of that murder

beyond a reasonable doubt, Jackson v. Virginia, supra, and could reasonably have found that the evidence excluded, beyond a reasonable doubt, every other reasonable hypothesis except that of the appellant's guilt. OCGA § 24-4-6 (Code Ann. § 38-109).

2) In his fourth enumeration of error, the appellant contends that the state was improperly allowed to impeach the credibility of Lorenzo Marshall by use of his prior allegedly coerced and involuntary statement.

The appellant asserts that there are both constitutional and common law evidentiary reasons for forbidding the use of involuntary statements to impeach a nondefendant witness.

Though the appellant raised no objection to the use of Marshall's prior statement at trial, thereby waiving his right to raise the objection on appeal, we will nonetheless consider his arguments. *Corn v. Hopper,* 244 Ga. 28 (6) (257 SE2d 533) (1979); *Sheffield v. State,* 235 Ga. 507 (2) (220 SE2d 265) (1975); *Hance v. State,* 245 Ga. 856 (5) (268 SE2d 339) (1980).

First, the appellant argues that he had his own due process right to prevent the prosecution from impeaching the credibility of a nondefendant witness by means of a prior involuntary statement because the reasons for excluding the use of a defendant's involuntary statement apply with equal force to statements of nondefendant witnesses. See, Jackson v. Denno, 378 U. S. 368 (84 SC 1774, 12 LE 2d 908) (1964); Culombe v. Connecticut, 367 U. S. 568 (81 SC 1860, 6 LE2d 1037) (1961).

We disagree that the due process reasons for excluding the use of a defendant's involuntary statement apply with equal force to the use of involuntary statements from nondefendant witnesses. The due process principle of excluding involuntary confessions rests, as we perceive it, not solely on the potential unreliability of such statements but also on the defendant's position in our system of justice. This principle has been enunciated by the United States Supreme Court. Rogers v. Richmond, 365 U. S. 354 (81 SC 735, 5 LE2d 760) (1961). In that case, the court stated that "To be sure, confessions cruelly extorted may be and have been, to an unascertained extent, found to be untrustworthy. But the constitutional principle of excluding confessions that are not voluntary does not rest on this consideration . . . Since a defendant had been subjected to pressures to which, under our accusatorial system, an accused should not be subjected, we were constrained to find that the procedures leading to this conviction had failed to afford him that due process of law which the Fourteenth Amendment guarantees." Rogers v. Richmond, supra, p. 541. The state may not prove the guilt of an accused by coerced statements from his own

mouth. Rogers v. Richmond, p. 541.

The distinction between using coerced statements of nondefendant witnesses as opposed to those of a defendant was also made in United States ex rel. Portelli v. LaVallee, 469 F2d 1239 (2nd Cir. 1972), cert. denied, 411 U.S. 950 (93 SC 1939, 36 LE2d 412) (1973). In that case, the Second Circuit considered whether the due process rights of the defendant had been violated by the use of a damaging witness' statement and testimony at trial, when the witness' statement had been coerced. The court approved the use of the witness' statement and testimony and found no violation of the defendant's due process rights. It did so on the basis that the defendant had had a full opportunity to inquire into the circumstances surrounding the making of the statement, thereby giving the jury the opportunity to pass upon the credibility and veracity of the witness' statement and testimony. It found this situation distinguishable from cases involving a defendant's coerced confession. We agree with the general principle of this case.[1]

In the instant case, because Marshall was on the witness stand and available to be questioned concerning his statement to the police and because one of the due process principles for excluding involuntary confessions (the defendant's position in our system of justice) does not apply to nondefendant witnesses who take the stand at trial, we find that no due process rights of the appellant were violated.

For the same reasons as enunciated above, we find that there are no common law evidentiary reasons for forbidding the use of Marshall's prior statement for impeachment purposes.

3) In his fifth enumeration of error, the appellant contends that the trial court erred in allowing the appellant's ex-wife to testify to communications made to her by him during the time they were married.

We disagree. OCGA § 24-9-21 (1) (Code Ann. § 38-418) provides that communications between a husband and wife are inadmissible on grounds of public policy. However, for this exclusion to apply, the communications must be confidential, *Ga. Intl. Life Ins. Co. v. Boney,* 139 Ga. App. 575 (2) (228 SE2d 731) (1976); *Lowry v. Lowry,* 170 Ga. 349 (6) (153 SE 11) (1930). Confidential communications are those where one spouse derives knowledge from the other by virtue of

---

[1] We note, however, that the circumstances surrounding the witness' statement in that case were quite egregious and that under the proper facts, which are not presented there, public policy reasons might forbid the use of such statements in certain situations.

the special confidence of the husband-wife relationship. *Ga. Intl. Life Ins. Co. v. Boney,* supra, pp. 578-579. Every spoken word between a husband and wife is not confidential; if the communication is an impersonal one not made in reliance on the marital relationship, the communication is not confidential, and no policy reason bars its admissibility, *Ga. Intl. Life Ins. Co. v. Boney,* supra, p. 579.

In the instant case, we find the communications testified to by the appellant's ex-wife were not confidential. She testified only to such matters as the time the appellant called her from the office the afternoon of August 31, 1972, the time he told her that he and his father arrived there, and the fact that the appellant told her, after the party in their honor, he was going to return to the office to make sure it had been locked. These communications were clearly not made to the appellant's ex-wife by virtue of trust he placed in her as his wife. They were impersonal communications concerning his daily activities. Consequently, the trial court did not err in allowing her to testify.

4) In the appellant's final enumeration of error, he contends that the trial court erred in not granting a directed verdict of not guilty on the ground that the investigation of the appellant involved police misconduct so fundamentally unfair and shocking that it violated due process.

The appellant objects to what he alleges were intimidating interrogation techniques of several witnesses, particularly Lorenzo Marshall, Ed Wrentz, and John Goodman.

Excerpts from the tape recordings of these interrogations were read into the record by the defense counsel while cross-examining the above witnesses. These excerpts reveal that the police used some questionable interrogation techniques, such as trickery, intimidation, and isolation, though it is difficult to judge the extent of their use from the limited excerpts available. For instance, the excerpts show the interrogating officers told these witnesses, among other things, that their fingerprints had been found at the grave site, that they could be tried for murder on the basis of what the police knew, and that they might go to jail for a long time. Also, Lorenzo Marshall was interrogated from 8:00 a.m. until 6:00 p.m. without being allowed to eat.

While we do not condone such activity, we perceive no basis upon which an indictment should have been dismissed or a directed verdict granted.

This court and the United States Supreme Court have held that when considering the appropriate remedy for an alleged constitutional violation involving governmental misconduct, the remedy should be tailored to the injury suffered from the violation

alleged and should not result in the dismissal of an indictment, or as is also sought here, in the granting of a directed verdict, when the case may proceed with full recognition of the defendant's right to a fair trial. *Jordon v. State,* 247 Ga. 328 (1) (276 SE2d 224) (1981); United States v. Morrison, 449 U.S. 361, 365 (101 SC 665, 66 LE2d 564) (1981).

In this case, the constitutional violation alleged is questionable police interrogation techniques, and the injury suffered is the possible inducement of potentially unreliable coerced or involuntary statements from witnesses subjected to these techniques. We note that the injury alleged here is not a direct one to the appellant such as where his own confession obtained by coercion is sought to be introduced. See, United States ex rel. Portelli v. LaVallee, supra.

We find that the appropriate remedy for the violation alleged in this case, the use of questionable interrogation techniques upon witnesses, is that stated in United States ex rel. Portelli v. LaVallee, supra, which is the defendant's right to fully cross-examine any witnesses called at trial concerning their interrogations. This remedy fits the violation alleged and assures the defendant of a fair trial by giving him an opportunity to fully place before the jury the issue of the credibility and veracity of the witnesses' testimony and statements, a remedy which the transcript shows defense counsel fully used in the instant case. *Jordan v. State,* supra; United States v. Morrison, supra. Consequently, we find that the trial court acted properly in not dismissing the indictment and in not granting a directed verdict, two drastic remedies which would have brought the criminal proceeding to a halt.

Here, it is anomalous for the appellant to urge the questionable police interrogation techniques used against witnesses called in his trial should have brought a halt to the criminal proceedings, when the remedy for his own coerced or involuntary confession, if there had been one, would have been merely the suppression of that statement. As indicated above, we decline to so hold.

5) Wilcox's second enumeration of error concerns the voir dire questioning of Sandra Finland. The district attorney asked Mrs. Finland if she had "formed any opinion as to the guilt or innocence of the accused." She responded, "It's hard to answer." At that point the trial judge asked her whether if she were selected as a juror she would disregard any opinion she might have formed and instead would decide the case on evidence presented during trial under the law given her as charged by the court. She answered affirmatively. The district attorney then questioned Mrs. Finland whether she knew of any reason why she could not be a fair and impartial juror. She said she didn't.

Defense counsel subsequently asked, "Have you formed any opinion at all about this case?" A. "Yes, sir." Q. ". . . I take it that you lean to one side or to the other?" A. "Yes, sir." . . . Q. "What is your opinion at this time?" A. "Guilty." Q. ". . . would it be fair to say that it would take some evidence — that some evidence would have to be introduced in order to erase that opinion from your mind?" A. "Yes, sir." At this point the court again intervened, and substantially repeated his earlier question, asking her whether despite the fact that she had an opinion with respect to the guilt or innocence of the accused, she could yield that opinion and arrive at a decision based solely upon evidence and instructions, and again she answered affirmatively.

Defense counsel then repeated his question concerning her misunderstanding that appellant had the burden to produce evidence to overcome her opinion that he was guilty, and again she responded in the affirmative. Appellant challenged her for cause, and the court overruled the challenge. At the end of voir dire appellant exercised his second peremptory strike against Mrs. Finland. However, he did not exhaust his available strikes, using only nineteen out of twenty before twelve jurors were accepted. On appeal he contends the failure to grant his challenge first, was an abuse of discretion, since the juror's mind was not perfectly impartial between the state and the accused and thus rendered her incompetent to serve, OCGA § 15-12-164 (a) (3), (c) (Code Ann. §§ 59-806, 59-807), and second, impermissibly shifted the burden of proof to appellant.

This enumeration is without merit. Mrs. Finland twice averred (the second time after defense counsel had already elicited her opinion concerning the burden of proof) that if selected she would arrive at a decision based solely upon the evidence adduced at trial and the instructions on the law given her by the court. We cannot conclude from the record that her opinion concerning a matter of law was so fixed that she would not follow the instructions of the trial court. The judge did not abuse his discretion in refusing to dismiss her for favor. *Woods v. State,* 240 Ga. 265 (4) (239 SE2d 786) (1977); *Welch v. State,* 237 Ga. 665 (5) (229 SE2d 390) (1976) (juror at one point stated he thought defendants should have to prove their innocence, but judge ruled legal burden requirements would be given to the jurors in the charge); see *Tennon v. State,* 235 Ga. 594 (2) (220 SE2d 914) (1975). Moreover, even assuming the court erred in qualifying Mrs. Finland, appellant didn't use all his allotted peremptory strikes and the error, if any, was harmless. *Strickland v. State,* 247 Ga. 219 (15) (275 SE2d 29) (1981); *Gee v. State,* 239 Ga. 583 (1) (238 SE2d 356) (1977); *Welch v. State,* supra.

6) In his first enumeration of error, appellant complains of the failure of the trial court to dismiss for cause three traverse jury venirepersons, Nutt, Parrish, and Swank. Each was questioned and challenged, and nevertheless qualified by the court. Upon the close of voir dire appellant exercised his fifteenth and sixteenth peremptory stirkes to remove Nutt and Parrish, respectively. However, as we noted in Division (5), supra, he used only nineteen of his twenty allotted strikes before twelve jurors were impaneled. Two alternate jurors were then to be selected. Wilcox was allotted four peremptory strikes to use in choosing the alternates. He used his first strike against Swank. Neither alternate ever sat as a juror.

On appeal Wilcox claims that OCGA § 15-12-133 (Code Ann. § 59-705) gave him an absolute right to uncover "any opinion as to which party ought to prevail," and that the trial court not only abridged his statutory right but also unconstitutionally denied him trial by an impartial jury and effective assistance of counsel. We disagree.

First, we note that the constitutional ground was not raised at trial, but in any event has no merit since, as we decide below, there was no harmful abridgment of defendant's § 15-12-133 (Code Ann. § 59-705) right. Second, appellant's objection to Mrs. Nutt was based solely upon an allegedly equivocal answer she gave during voir dire; he has not argued that ground before us, and he may not raise any other ground for challenge on appeal. The trial court did not abuse his discretion in overruling the challenge to Nutt. Third, Swank's name was not called before the twelve venirepersons who tried the case were selected, and no alternate actually sat on the jury; therefore, any error in qualifying her as a prospective juror was harmless. Thus the only challenge we have left to consider is the challenge to Parrish.

During examination of Mrs. Parrish the trial court queried her whether she knew of any reason why she couldn't be a fair and impartial juror, and she answered she didn't. Later, defense counsel asked her if she had "a leaning or inclination towards one side of the case or the other?" A. "Uh-hunh." (sic). The court intervened, and as before asked whether she could disregard her opinion and decide the case solely on trial evidence and instructions. She said she could and would.

Defense counsel persisted, and asked if she still had the "leaning." See answered yes, "but I do feel like I could be a fair juror." The court again intervened and questioned her, and again she affirmed that she would disregard her leaning and limit herself to consideration of evidence and instructions presented at trial.

Appellant's lawyer then said, "Let me ask if your inclination or

your leaning is in favor of or against —" The Court: "I'm not going to let you ask that." Appellant later challenged for cause, claiming Parrish was "leaning in one direction," and complaining that he should have been allowed to discover in which direction she leaned.

We find no abuse of discretion by the trial court.

"Since the distinction between questions which asked jurors how they would decide issues of a case if and when such issues are presented and questions which merely inquire whether jurors can start the case without bias or prior inclination is not always crystal clear, the 'control of the voir dire examination is vested in the sound legal discretion of the trial judge and will not be interfered with by this court unless the record clearly shows an abuse of that discretion.' " *Waters v. State,* 248 Ga. 355 (3) (283 SE2d 238) (1981). *Welch v. State,* 237 Ga. 665, supra. "Furthermore, there is no evidence that [appellant] utilized all of [his] peremptory strikes. Therefore [he was] not harmed even if the trial judge erred in not striking [the] juror for cause." *Welch,* id., p. 671.

For the reasons stated above, we affirm.

*Judgment affirmed. All the Justices concur, except Clarke, Gregory and Weltner, JJ., who concur specially.*

DECIDED MARCH 18, 1983 —
REHEARING DENIED MARCH 30, 1983.

*Coleman & Kitchens, Wilby C. Coleman, Cook & Palmour, Bobby Lee Cook,* for appellant.

*H. Lamar Cole, District Attorney, Michael J. Bowers, Attorney General, Virginia H. Jefferies, Staff Assistant Attorney General,* for appellee.

GREGORY, Justice, concurring specially.

I agree with the result reached by the majority in this case. With regard to Division 5 of the opinion, I agree that the trial court did not abuse its discretion in refusing to dismiss juror Finland for favor. However, for reasons which I stated in *Blankenship v. State,* 247 Ga. 590, 597 (277 SE2d 505) (1981), I am not persuaded that any error in qualifying Finland was harmless on the ground that appellant failed to exhaust his peremptory strikes.

I am authorized to state that Justice Clarke and Justice Weltner join in this special concurrence.